**ATTALLAH BRIGHTWELL, Pro-Se**

5 Park Road,

Paterson, NJ 07505

Telephone: (551) 404-8616

Email:     Attallah.brightwell@ yahoo.com



2022 MAY 23  A 10: 47

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

ATTALLAH BRIGHTWELL,

           Plaintiff

v.

NEW JERSEY DEPARTMENT OF
CHILDREN AND FAMILIES AND
OFFICE OF LICENSNG;  HELEN
EMOND; JENNIFER THIEL;JULISSA
STUBNICKI; SHARONDA CLARK;
ANTOINETTE FRANKLIN; MARIA
ALTERMIRANO; THERESEA ROSSENER;
ANTOINETTE MAHAN; KATHRYN
O'CONNELL; JANET HOCHMAN; BRIAN
ROSS; DIANE CAMISO;JOHN DOE (1-12)
AND XYZ (1-12), all of whose true names
are unknown, INCLUSIVE

           Defendants

       Plaintiff Attallah Brightwell, 5 Park Road, Paterson, New Jersey 07505,
allege the following:

## I.    NATURE OF THE ACTION

1.      This is an action for relief from employment discrimination
in violation of Chapter 42, Section 1983 of the Plaintiff's rights under the Fourteenth
Amendment's Equal Protection and or the Procedural Due Process Clause, the New Jersey Law
Against Discrimination, New Jersey Constitution Equal Protection Clause and Procedural Due
Process, Intentional Tortious Interference of Contract and Prospective Advantage and New
Jersey Consciousness Employee Protection Act.

2.      Plaintiff Attallah Brightwell allege that Defendants New Jersey Department of
Children and Office of Licensing, Helen Emond, Jennifer Thiel,
Julissa Stubnicki, Sharonda Clark, Antoniette Franklin, Maria Altermirano, Theresea Rossener,
Antoinette Mahan, Kathryn O'Connell, Janet Hochman,
Brian Ross; Diane Camiso and John (or Jane) Does 1-12, and XYZ 1-12 all of whose true
names are unknown (collectively, "Defendants"), unlawfully discriminated against
her on the basis of her national origin characteristic, including race, and harassed
her on the basis of national origin and retaliated against her.

3.      Plaintiff further alleges that Defendants' policies, practices, and decisions—all
that they established and enforced—had a disparate impact upon her based on her national
origin, African American and the operator of a low-income center.

4.      Plaintiff further alleges that the above disparate treatment impact affected her
rights under U.S. Constitution Fourteenth Amendment's Due Process and Equal Protection
Clause along with her rights under the New Jersey Constitution's Equal Protection and Due
Process Clause.

5.      Plaintiff further alleges that Defendants intentionally interfered with her existing
contractual relationship and also with prospective advantage.

6.      Plaintiff further alleges that the Defendants violated her rights under
the New Jersey Conscientious Employee Protection Act.

7.     Plaintiff seeks, compensatory damages, punitive damages, liquidated damages, and reasonable attorneys' fees and costs as remedies for Defendants' violations of their rights.

## II.  THE PARTIES

8.     Plaintiff is an Early Educational Psychologist and owner, head-teacher, and director of The Brightwell Center for Children (formerly Blocks & Bridges Child Development Center) located at: 1410 Teaneck Road, Teaneck since 1991.

9.     Plaintiff planned in 2011 to sell the business around 2022 and relocate out of the State of New Jersey.

10.    The Plaintiff discovered and confirmed in May 2021 that the long-term harassment and abuse of power at the hands of employees of The Department of Children and Families and Office of Licensing was planned by the defendants and motivated by discrimination and retaliation to destroy the Plaintiffs thirty-one - year successful child care center. The Plaintiff discovered that the defendants' conduct continued to violate her civil rights to procedural due process.

11.    The intentional acts occurred from February 2012 through 2020 on various days and times between 9:00 pm and 5:00 pm; for upward of five hours; and from 2020 to date, the Defendants have interfered in the Plaintiff's right to be granted a normal and typical inspections process for no good cause.

12.    Defendant Department of Children and Families' Office of Licensing is the agency responsible for the licensing and monitoring of 4,718 child care centers in the State of New Jersey with only 44 child care inspectors employed.

13.    The Plaintiff has not been issued a permanent, three-year license since 2009 (issued 2009 until 2012). The Plaintiff has held an unblemished record prior to 2012 and enjoyed a productive working relationship with DCF and OOL since 1991.

14.     In March 2020 the Plaintiff closed her business for four-months as a result of the novel coronavirus pandemic.

15.     In April 2020 Plaintiff received notification via email from Defendants OOL advising of the mandated health practices upon re-opening. The notice, cited Executive Order 149 and described the practices as expected from Inspectors upon visiting to conduct a "COVID "inspection".

16.     Upon arrival, inspectors were required to present their temperature from a personal thermometer to staff; hand wash; and staff were required to remain "6 feet away from inspectors at all times" (protecting the inspector not the provider).
In May 2020 the Plaintiff removed a wall in one classroom to allow for adequate social distancing of the children upon return.

17.     Upon information and belief, the Defendants, Department of Children and Families (hereinafter, "DCF"), Office of Licensing, (hereinafter, "OOL"), Helen Emond (hereinafter, "Defendant Emond"),  Jennifer Thiel, (hereinafter, "Defendant Thiel"), Julissa Stubnicki, (hereinafter "Defendant Stubnicki"), Sharonda Clark, (hereinafter, "Defendant Clark"), Antoinette Franklin, (hereinafter, "Defendant Franklin"), Maria Altermirano, (hereinafter, "Defendant, Altermirano"), Theressa Rossener, (hereinafter, "Defendant Rossener"), Antoinette Mahan, (hereinafter, "Defendant Mahan"), Kathryn O'Connell, (hereinafter, "Defendant O'Cconnell), Janet Hochman, (hereinafter, "Defendant O'Connell"), Janet Hochman, (hereinafter, "Defendant Hochman"), Brian Ross, (hereinafter "Defendant Ross); and Diane Camiso, (hereinafter, "Defendant Camiso) are all employees of The New Jersey Department of Children and Families located at: 50 State Street, Trenton, New Jersey 08608.

18.     Defendant New Jersey Children and Families' Office of Licensing was an "employer" within the meaning of the New Jersey Law Against Discrimination, and the New Jersey Conscientious Employee Protection Act.

19.     Plaintiff is informed and believe and thereon allege that at all times relevant herein, each of the Defendant Does 1-12 and XYZ 1-12 were responsible in some manner for the occurrences and injuries alleged in this complaint. The names of Defendant Does 1-12 and capacities are currently unknown to Plaintiff. Plaintiff will amend this Complaint to show such true names and capacities when the same have been ascertained.

## III.   JURISDICTION AND VENUE

20.     This Court has jurisdiction of Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331, as this case involves questions of federal law.

21.     This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution. Plaintiff's state law claims share all common operative facts with their federal law claims, and the parties are identical. Resolving Plaintiff's federal and state claims in a single action serves the interests of judicial economy, convenience, consistency, and fairness to the parties.

22.     Venue is proper in, and Defendants are subject to the personal jurisdiction of, this Court because Defendants maintain facilities and business operations in this District, and all or most of the events giving rise to this action occurred in this District. 28 U.S.C. § 1391(b); 42 U.S.C. § 2000e-5(f)(3).

## IV.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

23.     On July 26, 2020  the Plaintiff filed a claim with The Department of Children and Families' Equal Opportunity Employer agency at the suggestion of Supervisor Defendant Rosseener. On March 19, 2021 the Plaintiff received a notice that her claim was unfounded.

24.     On May 25, 2021 the Plaintiff filed a complaint with DCF (Diane
Casimo) requesting an administrative hearing. As of today, May 15, 2022 the Plaintiff
has not received the findings of this investigation nor has she been provided the
option for a due process hearing.

25.     Plaintiff timely filed charges of discrimination with the New Jersey
Department of Treasury on or around June 21, 2021 the Department of Treasury
denied the claim in December 2021. Plaintiff has timely filed this action and have complied with
all administrative prerequisites to bring this lawsuit.

## V.     FACTUAL ALLEGATIONS

26.     The Plaintiff repeats and reiterates each and every allegation in the
proceeding paragraphs and incorporates the same herein by reference.

The Plaintiff is a member of two protected classes which are protected by the Law of

Discrimination. The Plaintiff both a woman and Black.

27.     The Plaintiff experienced disparate treatment by the Defendants. This
treatment was not afflicted and never would be afflicted upon owners/directors not from
the protected class.

28.     The Defendants treated Plaintiff as an employee during their
investigative-like inspection on over 25 plus occasions for upwards of 5 hours each
visit, for no good cause.

29.     The Defendants intentional and reckless behavior was conducted in the
presence of enrolled parents; visiting parents; para professionals; staff; and children
in an attempt to embarrass and defame the Plaintiff's ability as a child care operator.

30.     Defendants required the Plaintiff to follow their curriculum and
classroom floor plan; implement their approach to toilet training; enforce their choice of late
pick-up charges for parents; permit non-enrolled parents to visit at any time; create a business
email account separate from her personal; review email daily; store paper logs in the cabinets
and not on the shelf; write daily logs to parents using their requirements; defendants require
Plaintiff to provide training for staff that goes above and beyond child care.

31.     On July, 2020 Defendants Rossener and O'Connell arrived at the Plaintiff's
center in her absence. Upon arrival they failed to present their temperature check, hand wash,
and social distance from staff. Instead of a brief inspection they stood in a dark room from over
90 minutes, approximately one foot from 2 staff members while 15 children slept, in defiance of
health safety regulations in the midst of a deadly pandemic. Most of the children were of color
and the staff all women of color suffering from the named underlying health concerns as
described by the World Health Organization as those chronic illnesses causing death if COVID is
contracted.

32.     The staff contacted the Plaintiff who then spoke to Defendant O'Connell
who immediately began to advise the Plaintiff of baseless and fabricated violations while
ignoring completely COVID protocol and the safety of the children and staff.

33.     The Plaintiff inquired to Defendant O'Connell about the newly enlarged
classroom and the Defendant dismissed the Plaintiff's inquiry.

34.     Defendant Rossener suggested to end the inspection but Defendant
O'Connell responded "no let's stay" without good cause in the midst of a deadly pandemic.

35.     On July 16, 2020 the Plaintiff began to contact White-owned and directed
centers in the area to inquiry whether they too had a lengthy "COVID" inspection and none of
them had.

36.     The Plaintiff was advised that the inspectors stuck their heads in the door
for a brief 10-15 minutes and asked COVID questions from a report card like document.

37.     The Plaintiff advised her enrolled parents that their children may have
been exposed to deadly COVID as visiting DCF OOL inspectors had not followed
Executive Order 149.The parents contacted DCF and OOL with no response. Several
parents terminated service with concerns that the Plaintiff could not protect the health
safety of their children.

38.     The Plaintiff's reliable Office Manager also terminated employment
services as she, as the Plaintiff suffered from a chronic illness placing her at risk to
have a fatal response if contracting COVID.

39.     On or around July 20, 2020 the Plaintiff contacted Defendant
O'Connell with concerns about the inspection on July 15. She received no response.

40.     On or around July 20, 2020 the Plaintiff contacted Defendant
Rossener, (supervisor) as she introduced herself prior, with whom she had a pleasant
relationship with until she joined the other Defendants in their plan to destroy the
Plaintiff's business. Rossener advised that she couldn't answer any questions and
directed the Plaintiff to DCF'S Equal Employment Opportunity Division.

41.     On July 26, 2020 the Plaintiff filed a complaint with DCF'S EOE and
received a denial notice on March 19, 2021.

42.     On or around July 26, 2020 the Plaintiff contacted Defendant Ross
with concerns about her inability to receive assistance with her concerns to protect the
children in her care, the staff, and herself from reckless DCF inspections who ignore
Executive Order 149 in the midst of a deadly pandemic. Defendant Ross was
patronizing and showed no interest in the Plaintiff's concerns.

43.     Defendant Ross ignored the safety concerns of the Plaintiff's
children of color and staff of color during a health state of emergency. Defendant
Ross advised the client that at no point were inspectors expected to present their own

thermometers (even though there was written notice of such). He advised that the 90-minute inspection wasn't long enough that inspectors should have stayed longer.

44.     When Plaintiff advised Defendant Ross that the local health department canceled their scheduled inspection with the Plaintiff, Defendant Ross called them "irresponsible" for canceling the inspection.

45.     Around March 2021 the Plaintiff was contacted by a non-defendant, Black female inspector who advised that she was the Plaintiff's inspector assigned to conduct the renewal process (for the renewal of the license). The Inspector, as the Defendants (other than Defendant Thiel) were assigned from out of their district as all of the inspectors from Bergen County assigned to the Plaintiff, joined in on the retaliation against her which is why inspectors from out of Bergen County were assigned to inspect, but they too (excluding the new inspector) would participate in the willful misconduct.

46.     Around early May 2021 the new non-defendant inspector and another inspector, arrived at the Plaintiff's center to conduct the renewal process. The inspector with whom the Plaintiff had been in contact was surprised when she attempted to review the Plaintiff's prior file only to realize that it was in disarray. She stated out loud to herself that nothing was where it should be and that the occupancy for various classrooms was missing, including the infant room, the Plaintiff's most popular classroom. On several occasions, the Defendants all commented on how the defendant's infant room was the only that they visited that included "real wooden cribs" and that the room looked like a "real" nursery.

47.     The Plaintiff was assigned "occupancy" of each classroom upon opening the center in Teaneck in 2003. The Plaintiff was given over 25 inspections by which the file should have been in proper order.

48.     The number of children assigned is critical to the operation of every child care center as it is the foundation upon which the enter operates and thrives or not.

49.     The inspector was not made aware of the Plaintiff's newly enlarged

room even though Defendant O'Connell and Defendant Roseneer after they conducted a 90- minute inspection on July 15, 2022 there was no mention of the newly formed room.

50.    The new inspector advised the Plaintiff that she could not measure the new classroom or re- measure any of the others, that the Plaintiff had to request a measuring which would take several weeks for her to return.

51.    This intentional interference with the Plaintiffs' file (by the Defendants) interfered with the Plaintiff's summer enrollment as she was now unaware of the number of children that she could accommodate in each classroom.

52.    After the inspection, the Plaintiff realized that the harassment from 2012 was a planned effort by the Defendants to destroy her thirty-year-old center and reduce it from an economically successful business to one that would be consider as a lower-economic business and unable to compete with White centers.

53.    The Defendants had reduced the Plaintiff's successful and respected school to a low-income babysitting service through a methodical and systematic plan that each newly assigned inspector-defendant would participate. In an egregious and discriminatory approach which had never been inflicted upon a White center owner. Such unlawful behavior was only permitted to persist because the Plaintiff was a Black woman.

54.    On May 20, 2021 the Plaintiff filed a complaint with the Department of Treasury and on June 1, 2021 she filed an amendment to include her updated findings. The Plaintiff never received any notice from the Department of Treasury as to the status of her complaint. On January 28, 2020 the Plaintiff contacted the agency with questions regarding her complaint but was advised that The Department of Treasury was not the agency to review such a complaint.

55.    Plaintiff was aware that the harassment towards her by the Defendants was

the result of her choice to terminate the child care service of Defendant Emond, former enrolled parent and employee of DCF who advised the Plaintiff that her behaviorally challenged boys were "too beautiful to discipline."

56. Emond then filed an informal complaint with her co-workers who then began a long- term campaign to dismantle the Plaintiff's center. The Plaintiff did not realize the magnitude of the practice of discrimination and the promise by Theil in 2013 to reduce her number of children would take place.

57. After Defendant Emond published several defamatory and fabricated    posts about the Plaintiff on several local social media sites, in which she included her name and the date with her displeasure towards the Plaintiff. Her timeline coincided with the time that the harassment began. A fact that the Plaintiff learned 18 months after the harassment began as an interested parent advised the Plaintiff of the postings.

58. In November 2013, Theil arrived at the Plaintiff's center for no good cause as the Plaintiff was in possession of a temporary operating license awaiting her air quality inspection. Plaintiff had not met Thiel prior.

59. Upon arrival, Theil entered enraged and angry at Plaintiff for unknown reasons at the time. Her attack was personal. Upon entering the 4,000 square foot building, she announced that the center was the filthiest that she had ever seen and that she was going to request to her supervisors that the number of children enrolled in her infant room be reduced, for no good cause as the Plaintiff's infant room operated within the capacity permitted with the appropriate number of staff.

60. Defendant Theil would announce in the presence of enrolled parents; visiting parents; para professionals; staff and children that she was not qualified to work with two-year-old children.

61. Defendant Thiel announces other fabricated violations and announced that there were not enough lines on the inspection report for all of the violations. (The Plaintiff had

never been cited for a laundry list of violations prior to Thiel's visit).

62.     After Theil's angry exit the Plaintiff contacted Marilyn Weiss, Supervisor to report the behavior of Thiel and to advise that she not be sent back to inspect. Defendant Weiss announced "Jennifer is just having a bad day" with no further assistance.

63.     Prior to Theil's departure she did not provide an inspection report as prior inspectors. The Plaintiff did not sign or agree to any violations cited. The fabricated violations have damaged the Plaintiff's reputation now and in the future as the file from DCF is part of her resume for future employment opportunities.

64.     Several weeks later, Defendants Stubnicki and Clark would arrive for yet another inspection, before the Plaintiff received the report as prepared by Theil. It was clear that the Defendants arrived with a purpose to interfere with the Plaintiff's operating day. They would stay for upwards of 5 hours standing around and harassing the Plaintiff and her staff.

65.     Over the next several months, Defendants Stubnicki and Clark would visit the Plaintiff's center for no good cause. On one visit Stubnicki asked the race of the children in one classroom. Clark threatened to unlawfully revoke the Plaintiff's license in the presence of enrolled parents and para professionals; they would fabricate violations on a legal inspection document; cite Plaintiff for having too few injuries and too few injurie as though the Plaintiff's Black center is expected to operate in a reckless manner in which the children get injured and arrive to the center ill.

66.     The Plaintiff contacted Supervisor Defendant Hochman regarding her complaints and demanding to have an administrative hearing to contest the violations. She was denied a hearing.

67.     The Plaintiff contacted Director-Defendant, Antoinette Mahan regarding her complaints and demanding an administrative hearing to contest the cited violations. She was again denied a hearing.

68. Around 2016 the Plaintiff filed an injury claim against Defendants: Emond; Thiel; Clark; Stubnicki; Mahan; Weiss; Hochman; and Stubnicki. The Defendants continued retaliating against the Plaintiff as did new Inspectors who were assigned to participate in the long-term and lengthy unwarranted inspections.

69. Around March 2018 one of the nine counts was dismissed by the court. The dismissal was based upon an unpublished article. The court ignored the unlawful conduct of the inspector who impersonated another person.

70. On January 2019 the Plaintiff filed an appeal. The complaint would be denied around January 2020.

71. On or around 2017 Defendants Franklin and Altermirano were assigned to Plaintiff's center. As the other inspectors, they would join the previous Defendants in a campaign to destroy the Plaintiff's successful business. They begin a series of 11 unlawful, lengthy, and unwarranted inspections, 9 with 2 larger uniformed and armed officers without good cause. Misconduct that would not have been approved if the Plaintiff were a White woman. Defendants caused a hostile and emotionally charged environment in the presence of preschool boys, mostly Black.

72. Defendant Franklin attempted to convince the local fire chief to cite the Plaintiff for fabricated fire code violations. Defendant Franklin also demanded that Plaintiff allow her access into a fire room that prohibited anyone other than fire officials as the fire room controls the entire strip mall where the Plaintiff's building is located.

73. Franklin advised Plaintiff that her landlords must be present on the premises at all times in the event that she "they" arrived for an inspection. Once on the phone with the Plaintiff's landlord she advised him of the same.

74. Defendant Altermirano contacted the local health department and impersonated herself as a parent to report a fabricated violation.

75.     Defendant DCF, OOL, and their agents published a public website and posted violations reports against the Open Public Records Act. Defendants did not advise providers of the website.

76.     Defendants DCF, OOL, and their agents fraudulently reorganized Plaintiff's "Bing" search engine to appear derogatory when reviewed by perspective parents. The Plaintiff's name was linked to DCF where parents were encouraged to file a complaint with them or the Better Business Bureau. BBB was not aware of why the Plaintiff's name was linked with their cite as she did not have any complaints filed against her. None of the White owned centers researched by Plaintiff were connected to DCF.

77.     Defendant O'Connell demanded that the Plaintiff dismantle her indoor gym without proof that it was included in the list of equipment prohibited by OOL.

78.     The Plaintiff spoke to another Black center owner of multiple centers who agreed that her center operated by a White director faired more favorable during the inspection process than did her center operated by a Black center.

79.     The Plaintiff discovered in April 2022 that she is in fact "an employee" of the Defendants' DCF and OOL. The Defendants created a hostile and racist work environment.

80.     The Defendants enforced a racist, discriminatory, and bias environment. The inspection process was discriminatory. One "favorite" White center, monitored by Defendant Thiel, was located in the top floor of a community center was cited for several major violations including a large downstairs unclean gathering room that was not licensed for the children, was being used as a playroom, even though strangers who did not have background and fingerprint clearance had access to the room while the children were present. There was also a

violation of a partial metal pole sticking up out the ground in the playground area hazardous to the safety of the children. This center only had 2 inspections while the Plaintiff's center, with no major violations received an upward of 25 inspections.

81.    Several other White owned centers with employees convicted of child molestation; child pornography; and other crimes against children received very few if any inspections.

82.    Defendants reduced Plaintiff's popular and financially successful early childhood program to a low-income babysitting service.

83.    Defendants forced the Plaintiff's center into a lower economic bracket then discriminated against her for being so.

84.    Counsel-Defendant Cosimo has prohibited Plaintiff from contacting her inspector or any other employee from DCF or OOL without good cause. Counsel-Defendant Cosimo has not provided Plaintiff with all of the necessary updated from OOL so that she can remain in compliance.

85.    Counsel-Defendant Cosimo continues to support and condone DCF OOL racist and discriminatory licensing practices and option to grant the 3- year license to whom they so choose.

86.    Defendant Thiel's promise in 2013 to reduce the number of children that the Plaintiff would be permitted to have with no good reason was a promise kept as the systematic plan to dismantle the Plaintiff's business would be complete and confirmed by the final inspector who unintentionally described a file in disarray.

## FIRST CLAIM OF RELIEF

87.      Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 through 86, above;

88.      New Jersey's Law Against Discrimination makes it unlawful for an employer to discriminate against an individual "in compensation or in terms, conditions or privileges of employment" because of national origin and ancestry

89.      Plaintiff are informed and believe and thereon allege that Defendants 'policies and procedures had an adverse and disproportionate impact on her because of her national origin, African American.

90.      Defendants' policies and/or practices were neither manifestly job-related nor consistent with business necessity.

91.      Less discriminatory alternatives existed to achieve Defendants' stated regulatory purposes.

92.      As a direct, legal and proximate result of the discrimination, Plaintiff has sustained, and will continue to sustain, economic damages to be proven at trial. As a result of Defendants' actions, Plaintiff has suffered emotional distress, resulting in damages in an amount to be proven at trial. Plaintiff further seeks compensatory and punitive damages and all other injunctive, declaratory, and monetary relief available for discrimination at trial.

93.      Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination based on national origin and ancestry

94.      Plaintiffs are entitled to reasonable attorneys' fees and costs of suit

## SECOND CLAIM FOR RELIEF
## National Origin-Based Discrimination (Hostile Work Environment) in Violation of New Jersey Law Against Discrimination

95.         Plaintiffs incorporate by reference as if fully set forth herein allegations contained in paragraphs 1 through 94, above.

96.         Plaintiff was subjected to harassment by Defendants' agents and employees, because of Plaintiff's national origin and ancestry.

97.         Plaintiff was subjected to verbal and written conduct, as well as policies and practices, by Defendants' agents and employees, including

98.         Defendants' agents and employees' conduct was not welcomed by plaintiff.

99.         Defendants' agents and employees' conduct was because of the fact that Plaintiff is a member in a protected class.

100.        The conduct was so severe or pervasive that a reasonable person in plaintiff's positions would find plaintiff's work environment to be hostile or abusive.

101.        Plaintiff found her work environment to be hostile or abusive as a result of Defendants' agents and employees' conduct.

102.        Management level employees knew, or should have known, of the abusive conduct. Plaintiff provided management level personnel, including and, with enough information to raise a probability of national origin and ancestry harassment in the mind of a reasonable employer, and/or the harassment was so pervasive and open that a reasonable employer would have had to have been aware of it. Indeed, management level employees were themselves complicit in the abusive conduct.

103.        Defendants did not exercise reasonable care to prevent harassment in the workplace on the basis of national origin and ancestry, and did not exercise reasonable care to promptly correct any harassing behavior that did occur.

104.        As a direct, legal and proximate result of the discrimination, Plaintiffs have sustained, and will continue to sustain, economic damages to be proven at trial. As a result of Defendants' actions, Plaintiffs have suffered emotional distress, resulting in damages in an

amount to be proven at trial. Plaintiff further seeks compensatory and punitive damages and all other injunctive, declaratory, and monetary relief available for discrimination at trial.

105.     Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination based on national origin and ancestry.

106.     Plaintiffs are entitled to reasonable attorneys' fees and cost of suit.

## THIRD CLAIM FOR RELIEF

## REPRISAL IN VIOLATION OF THE
## NEW JERSEY LAW AGAINST DISCRIMINATION

107.     Plaintiff incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 through 106, above.

108.     New Jersey's Law Against Discrimination makes it unlawful for an employer to "take reprisals against any person because that person has opposed any practices or acts forbidden under this act" or to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected in this act."

109.     Plaintiff made informal and formal complaints to Defendants' agents and employees opposing Defendants' unlawful, discriminatory employment practices based on national origin and sex.

110.     Plaintiff's complaints were made reasonably and in good faith.

111.     As a result of Plaintiff's complaints, Defendants' agents and employees took adverse actions against Plaintiff, including, but not limited to, issuing disciplinary warnings, such as

112.     As a direct, legal, and proximate result of Defendants' reprisals, Plaintiff

has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

113.        Plaintiff is entitled to her reasonable attorneys' fees and costs

# FOURTH CLAIM FOR RELIEF

## INTENTIONAL TORTIOUS INTERFERENCE

## WITH PROSPECTIVE ECONOMIC ADVANTAGE

114.        Plaintiff incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 through 114, above.

115.        The Plaintiff had a protectable interest with prospective and actual clients who did not enroll their children or terminated services due to the Defendants long-term and continuous investigative-like inspections.

116.        Defendants' actions forced Plaintiff into a low-income status business resulting in derogatory credit and the inability to access grants and funding allotted for small business during the relief phase of Post COVID.

117.        The Defendants acted with malice and beyond the scope of their duties to intentionally interfere with the Plaintiff's operation of business without justification.

# FIFTH CLAIM FOR RELIEF

## INTENTIONAL TORTIOUS INTERFERENCE WITH CONTRACT

118.        Plaintiff incorporates by reference as if fully set forth herein the allegations contained in paragraphs 1 through 117, above.

119.        Plaintiff has a contractual relationship with her employees, enrolled parents, landlord fire department, and health department.

120.        Plaintiff's long-term and reliable employees and office manager terminated employment service as a result of the pressure and harassment from Defendants.

121.        Another Office manager terminated services because she didn't believe that the Plaintiff could protect her health safety from the racist and unlawful Defendants.

122.        Parents terminated child care services concerned that Plaintiff was unable to protect their children from unlawful DCF OOL inspectors.

123.        Defendant Franklin and Altermirano's fraudulent acts with the local fire and health department interfered with the Plaintiff's productive working relationship with each agency.

124.        Defendant Franklin and Altermirano's unlawful demand of the Plaintiff's landlords interfered with the contract agreement between Plaintiff and the landlord.

125.        These Defendants were not parties to any of these agreements involving the Plaintiff with these other parties. Their actions were not justified and done with malicious intent.

126.        The defendants interfered with the Plaintiff's right to abate cited violations as the Defendants' goal was not to assist the Plaintiff but rather to interfere in the operation of business by conducting long-term and ongoing inspections in an attempt to find further violations.

127.     Defendants disallow Plaintiff to operated her own choice of child care

as a low-income center which will allow her to operate a "play-all-day" program as opposed to a

school-like setting as stated in Chapter 52.

128.     Defendants don't distinguish between "child care" and "school".  Rule

for child care are over-broad and lacks consistency.

## SIXTH CLAIM FOR RELIEF
## U.S. CONSTITUTION 14TH AMENDMENT VIOLATION OF EQUAL PROTECTION CLAUSE (Chapter 42, Section 1983)

129.     Plaintiff incorporates by reference as if fully set forth herein the

allegations contained in paragraphs 1 through 128 above. Defendants deprived the

Plaintiff of her civil rights under the 14th Amendment of Constitution, Equal Protection

Clause by causing Plaintiff to experience disparate treatment due to the Plaintiff's race.

130.     The Defendants have a complete disregard for the health safety of

people of color suffering from those chronic illnesses that place them at risk for a fatal

reaction from COVID.

131.     Defendants deprived the Plaintiff of her civil rights under the 14th

Amendment of the Constitution's Equal Protection Clause by causing Plaintiff to experience

disparate treatment due to the Plaintiff's race and socio-economic status.

132.     The Defendants used state action through its enforcement of state

regulations to cause this disparate treatment, Plaintiff experience economic damages as a result

of their actions.

133.     Defendant Clark threaten to revoke the Plaintiff's license without good cause, but unlawfully approved a White center owner's "new center" as a "continued use" when the building was never used as a center prior.  Such unlawful conduct jeopardizes the safety of the children.

134.     Defendant Clark's actions also may have permitted the center owner to access PPP funds allotted for existing businesses to use for her "new center" that both she and Defendant Clark have registered as a "continued use.

135.     Defendants DCF OOL failed to protect Plaintiff from racist and jealous inspectors who abuse their power to retaliate, harass, and discriminate against innocent providers.

136.     Defendant DCF OOL failed to discipline employee-agents who violate the law and act outside of the scope of their duties.

137.     The Defendant DCF failed to protect the Plaintiff from defamation; libel; willful misconduct; unlawful acts; racist actions of their employees; the unlawful tampering with online websites; and emotional distress.

138.     The Defendants' DCF OOL Manual for Childcare Centers fails to protect providers from racist and bias inspectors and employees.

## SEVENTH CLAIM FOR RELIEF
## U.S. CONSTITUTION 14TH AMENDMENT VIOLATIONOF
## PROCEDURAL DUE PROCESS CLAUSE
## (Chapter 42, Section1983)

139.     Plaintiff incorporates by reference as if fully set forth herein the

allegations contained in paragraphs 1 through 128, above.

140.     Defendants deprived the Plaintiff of her civil rights under the

14th Amendment of Constitution, Procedural Due Process Clause by denying the Plaintiff the

opportunity to have a hearing after the Plaintiff requested it.

141.     The Defendants denied the Plaintiff her right to due process when she

requested an administrative hearing to contest the fabricated violations in her file.

142.     Defendants used state action through its enforcement of state

regulations to cause the Plaintiff to be deprived of the Plaintiff's right to hearing regarding to her

complaint against them.

143.     Rules and regulations of Chapter 52 Manual for Child Care Centers, the

handbook by which centers are operated is over broad and lacks consistency.

144.     Desperate treatment towards Plaintiff as parents are given more access

to Plaintiff's records than Plaintiff.

## EIGTH CLAIM FOR RELIEF
## Violation of Equal Protection Clause of New Jersey
## Constitution

145.     Plaintiff incorporates by reference as if fully set forth herein the allegations

contained in paragraphs 1 through 132, above.

146.     The Defendants deprived the Plaintiff of her civil rights under the New

Jersey Constitution's Equal Protection Clause by causing Plaintiff to experience disparate

treatment due to the Plaintiff's race.

147.     Defendants used state action through its enforcement of state regulations to

cause this disparate treatment towards the Plaintiff.

## NINETH CLAIM FOR RELIEF

## Violation of Procedural Due Process Clause of New Jersey
## Constitution

148.     Plaintiff incorporates by reference as if fully set forth herein the

allegations contained in paragraphs 1 through 135, above.

149.     The Defendants deprived the Plaintiff of her civil rights under the New

Jersey Constitution's Procedural Due Process Clause by denying the Plaintiff the opportunity for

an administrative hearing to allow her the right to contest the fabricated violations cited in her

file.

150.     Defendants used state action through its power and support of state

regulation to cause the Plaintiff to be deprived of the right to be heard.

151.       As a result of the Defendant's denial of a hearing, Plaintiff experienced

damage.

## TENTH CLAIM OF RELIEF

### Violation of New Jersey CEPA Act

152.       Plaintiff incorporates by reference as if fully set forth herein the

allegations contained in paragraphs 1 through 151 above.

153.       At all times, the Plaintiff was an employee of the Defendant Children

and Families' Office of Licensing.

154.       Plaintiff advised the Defendant Children and Families' Office of

Licensing's managerial employees of the disparate treatment (race- based treatment) that the

Plaintiff was receiving from their employees.

155.       The Defendant Children and Families' Office of Licensing's managerial

employees became Complicit and accelerated this disparate treatment towards the Plaintiff.

144.       As a result of the Defendants' action, the Plaintiff was damaged and still

continue to experience damage.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.For lost wages and all other compensation denied or lost to Plaintiffs by reason of
Defendants' unlawful actions, in an amount to be proven at trial;

2.For compensatory damages for Plaintiffs' emotional pain and suffering, in an amount to
be proven at trial;

3. For punitive damages in an amount to be determined at trial;

4. For liquidated damages;

5. For interest on lost wages, compensation, and damages, including pre- and post-judgment interest and an upward adjustment for inflation

6. For reasonable attorneys' fees and costs of suit pursuant to 42 U.S.C. § 2000e-5(k),

New Jersey Revised Statutes § 10:5-27.1, and other laws; and

7. For such other and further relief as this Court deems just and proper.

Dated: 23 May 2022                    Respectfully submitted,

By: _____  5/23/22
                    ATTALLAH BRIGHTWELL

Pro-Se Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all causes of action and claims to which she has a right to a jury trial.